CASE NO: 13-13067-DD
L.T. CASE NO.: 13-cv-20090 JAL

UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

_____

PATRICIA FRANZA, as Personal
Representative of the Estate of
PASQUALE F. VAGLIO,

Plaintiff/Appellant,

vs.

ROYAL CARIBBEAN CRUISES, LTD.,
a Liberian corporation,

Defendant/Appellee.

_____

APPEAL TAKEN FROM
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

_____

APPELLANT'S INITIAL BRIEF

_____

Philip D. Parrish, Esq.                    Joel M. Barnett, Esq.
phil@parrishappeals.com                    waksbar@aol.com
PHILIP D. PARRISH, P.A.                    WAKS & BARNETT, P.A.
7301 SW 57th Ct, Suite 430                 9900 SW 107 Avenue, Suite 101
Miami, Florida 33143                       Miami, Florida 33176
Tel:   305-670-5550                        Tel:   305-670-5550
Fax:   305-670-5552                        Fax:   305-670-5552
*Attorneys for Appellant*                  *Attorneys for Appellant*

## <u>CERTIFICATE OF INTERESTED PERSONS</u><br><u>and CORPORATE DISCLOSURE STATEMENT</u>

Undersigned counsel for Appellant PATRICIA FRANZA, as Personal Representative of the Estate of PASQUALE F. VAGLIO certifies that the following is a complete list of persons and entities who have an interest in the outcome of this case.

## <u>TRIAL JUDGE</u>

United States District Judge Joan A. Lenard

United States Magistrate Judge John J. O'Sullivan

## <u>ATTORNEYS</u>

Joel M. Barnett, Esq., *Attorney for Plaintiff/Appellant*

Foreman Friedman, P.A*., Attorneys for Defendant/Appellee*

Darren W. Friedman, Esq., *Attorney for Defendant/Appellee*

Marcus Mahfood, Esq*., Attorney for Appellee*

Philip D. Parrish, Esq., *Attorney for Plaintiff/Appellant*

Philip D. Parrish, P.A., *Attorney for Plaintiff/Appellant*

Elisha Sullivan, Esq., *Attorney for Defendant*

Waks & Barnett, P.A., *Attorney for Plaintiff/Appellant*

C 1 of 2

## __PARTIES__

Patricia Franza, as Personal Representative of the
Estate of Pasquale F. Vaglio, *Plaintiff/Appellant*

Royal Caribbean Cruises, Ltd.,
a Liberian corporation (RCL), *Defendant/Appellee*

*/s/Philip D. Parrish*
Philip D. Parrish, Esq.
FBN: 541877

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is warranted because this is a case of first impression in this Circuit: Whether a cruise line may be sued by its passengers for the negligence of the ship's medical personnel.  In this appeal we ask the Court to answer that question in the affirmative and create conflict with a decision of the Fifth Circuit, to pave the way for review by the United States Supreme Court.

## CERTIFICATE OF TYPE SIZE AND FONT

Undersigned counsel certifies that the size and style of type used in this brief is 14-point Times New Roman.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS
and CORPORATE DISCLOSURE STATEMENT. . . . . . . . . . . . . . . . . . . 2

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . .  i

CERTIFICATE OF TYPE SIZE AND FONT. . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE AND FACTS. . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.     ON *DE NOVO* REVIEW OF THIS CASE OF FIRST IMPRESSION IN THIS
       CIRCUIT, THIS COURT SHOULD REJECT THE ANACHRONISTIC
       *BARBETTA* RULE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.    THE DISTRICT COURT ERRED IN RULING THAT THE PLAINTIFF HAS
       NOT STATED A VALID CAUSE OF ACTION BASED UPON THE
       THEORY OF APPARENT AGENCY. . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

CERTIFICATE OF COMPLIANCE........................................... 36

CERTIFICATE OF SERVICE........................................... 37

SERVICE LIST........................................... 38

# <u>TABLE OF AUTHORITIES</u>

*Amdur v. Zim Israel Navigation Co.*,
     310 F.Supp. 1033 (S.D. N.Y. 1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 22

*American Dental Association v. Cigna Corp.*,
     605 F.3d 1283 (11th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*American Export Lines, Inc. v. Alvez*,
     446 U.S. 274 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Barbetta v. S/S Bermuda Star*,
     848 F.2d 1364 (5th Cir. 1988). . . . . . . . . . . . . . . . . 6-10, 16-18, 20-22, 28-30

*Belik v. Carlson Travel Group, Inc.*,
     864 F.Supp.2d 1302 (S.D. Fla. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Bonnano v. Harvard Pilgrim Healthcare*,
     2000 WL 49639 (Mass. Super. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Boulis v. Fla. Dept. of Transp.*,
     733 So.2d 959 (Fla. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Carlisle v. Carnival Corp.*,
     864 So.2d 1 (Fla. 3d DCA 2004), *rev'd*,
     *Carnival Corp. v. Carlisle*,
     953 So.2d 461 (Fla. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 20-22, 30

*Chaparro v. Carnival Corp.*,
     693 F.3d 1333 (11th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 36

*Chapman v. Erie Railway Co.*,
     55 N.Y. 579 (N.Y. 1874). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Davis v. Portline Transportes Maritime Internacionale*,
     16 F.3d 532 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

iv

*Doe v. Celebrity Cruises, Inc.,*
   394 F.3d 891 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Doonan v. Carnival Corp.,*
   404 F.Supp.2d 1367 (S.D. Fla. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*East River S.S. Corp. v. Transamerica Delaval, Inc.,*
   476 U.S. 858 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Exxon Shipping Co. v. Baker*,
   554 U.S. 471 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Fairley v. Royal Cruise Line, Ltd.,*
   1993 AMC 1633 (S.D. Fla. 1993).. . . . . . . . . . . . . . . . . . . . . . . 8, 17-22, 32

*Feoffees of Heriot's Hospital v. Ross*,
   12 C + F. 507, 8 Eng. Rep. 1508 (1846).. . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Fojtasek v. NCL (Bahamas) Ltd.*,
   613 F.Supp.2d 1351 (S.D. Fla. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Furness Withy (Chartering), Inc. of Panama v.*
*World Energy Systems Assoc., Inc.,*
   772 F.2d 802 (11th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Gavigan v. Celebrity Cruise, Inc.*,
   843 F.Supp.2d 1254 (S.D. Fla. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Hill v. Celebrity Cruises, Inc.*,
   2011 WL 5360247 (S.D. Fla. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Huntley v. Carnival Corp.*,
   307 F.Supp.2d 1372 (S.D. Fla. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Irving v. Doctors Hosp. of Lake Worth, Inc.,*
   415 So.2d 55 (Fla. 4th DCA 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Jones v. Tallahassee Memorial Regional Healthcare, Inc.*,
    923 So.2d 1245 (Fla. 1st DCA 2006),
    *rev. dismissed,* 935 So.2d 500 (Fla. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Kermarec v. Compagnie Generale Transatlantique*,
    358 U.S. 625 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Kornberg v. Carnival Cruise Lines, Inc.*,
    741 F.2d 1332 (11th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Langfitt v. Federal Marine Terminals, Inc.*,
    647 F.3d 1116 (11th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Laubheim v. Netherland S.S. Co.*,
    107 N.Y. 228, 13 N.E. 781 (N.Y. Ct. App. 1887). . . . . . . . . . . . . . 10, 12-14

*Leslie v. Carnival Corp.*,
    22 So.3d 567 (Fla. 3d DCA 2009) (*en banc*) *rev. den.*,
    44 So.3d 1178 (Fla. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Lobegeiger v. Celebrity*,
    2011 WL 3703329 (S.D. Fla. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Mack v. Royal Caribbean Cruises Ltd.*,
    361 Ill.App.3d 856, 297 Ill.Dec. 593,
    838 N.E.2d 80 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 22, 27

*McDonald v. Massachusetts General Hospital*,
    120 Mass. 432 (1876). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Moragne v. States Marine Lines, Inc.*,
    398 U.S. 375 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Nietes v. American President Lines, Ltd.*,
    188 F.Supp. 219 (N.D. Cal. 1959). . . . . . . . . . . . . . . . . 13-15, 18, 20-22, 29

*Orlando Regional Medical Center v. Chmieleski*,

573 So.2d 876 (Fla. 5th DCA 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*O'Brien v. Cunard S.S. Co.,*
154 Mass. 272, 28 N.E. 266 (1891). . . . . . . . . . . . . . . . . . . . . . . . . . . 10-14

*Rinker v. Carnival Corp.,*
210 US District Lexis 144190.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Roessler v. Novak,*
858 So.2d 1162 (2d DCA 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*Stone v. Palms West Hospital,*
941 So.2d 514 (Fla. 4th DCA 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Suter v. Carnival Corp.,*
2007 WL 4662144 (S.D. Fla. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*The Great Northern,*
251 F. 826 (9th Cir. 1918). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*The Iroquois,*
194 U.S. 240 (1904). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*The Korea Maru,*
254 F. 397 (9th Cir. 1918). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Reliable Transfer Co.,*
421 U.S. 397 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Warren v. Ajax Navigational Corp. of Monrovia,*
1995 AMC 2601 (S.D. Fla. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34

*Wells v. Liddy,*
186 F.3d 505 (4th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Whetstone Candy Co. v. Kraft Foods, Inc.,*
51 F.3d 1067 (11th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Wilkinson v. Carnival Cruise Lines, Inc.,*
    920 F.2d 1560 (11th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Other Authorities

 28 U.S.C. §1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1291.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1333.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

46 U.S.C. 30509. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

46 U.S.C.A. §§3507.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

American College of Emergency Physicians
*Healthcare Guidelines for Cruise Ship Medical Facilities*
    ("ACEP Guidelines"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Beth Ann Erlic Herschaft, Comment*,*
*Cruise Ship Medical Malpractice Cases:*
*Must Admiralty Courts Steer by the Star of Stare Decisis?*
    17 Nova L. Rev. 574 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 26

M. Norris,
*The Law of Maritime Personal Injuries*,
    3:10 at 75.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Michael J. Compagno,
*Malpractice on the Love Boat: Barbetta v. SS Bermuda Star,*
    14 TLNMLJ 381 (Tulane Maritime Law Journal Spring 1990).. . . . . . . . 27

Restatement (Second) of Torts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 34

Robert D. Peltz,
*Has Time Passed Barbetta By?*
    24 U.S. Fl. Mar. L. J. 1 (Spring 2012) . . . . . . . . . . . . . . . . . . . . . . . . . 27-31

Robert D. Peltz
*The Myth of Uniformity in Maritime Law,*
  21 Tul.Mar.L.J. 103 (1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Thomas A. Dickerson,
*The Cruise Passenger's Dilemma: 21st Century Ships, 19th Century Rights,*
  28 TLNMLJ 447 (Tulane Maritime Law Journal 2004). . . . . . . . . . . . . . . 26

Thomas A. Gionis,
*Paradox on the High Seas: Evasive Standards of Medical Care -*
*Duty Without Standards of Care; A Call for the International*
*Regulation of Maritime Healthcare Aboard Ships,*
  34 JMARLR 751 (Spring 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## STATEMENT OF JURISDICTION

The District Court properly exercised diversity jurisdiction pursuant to 28 U.S.C. §1332 as well as admiralty jurisdiction pursuant to 28 U.S.C. §1333.

This Court may properly exercise jurisdiction over the subject order of dismissal pursuant to 28 U.S.C. §1291.

## ISSUES PRESENTED

1.    Whether this Court should join the modern trend and recognize that a common carrier ship owner, such as a cruise line, may be held vicariously liable when the vessel's medical personnel negligently treat the vessel's passengers?

2.    Whether, facts permitting, the cruise line may similarly be held liable under a theory of apparent agency for the negligence of its medical personnel in the treatment of the vessel's passengers?

## STATEMENT OF THE CASE AND FACTS

The Plaintiff's Decedent Pasquale F. Vaglio, and his wife, Josephine, were passengers aboard the Royal Caribbean Cruise, Ltd. ("RCCL") vessel "Explorer of the Seas" on July 23, 2011. The vessel was docked at Bermuda on that date.  When Mr. Vaglio was leaving the vessel, and getting onto a trolley near the dock, he fell and sustained a severe blow to his head. [DE 1 ¶10]. He was taken via wheelchair to

1

the ship's infirmary where he was evaluated by RCCL medical personnel, who informed him and his wife that he was fine to return to his cabin, but he might have a concussion and that his wife should observe him. [DE 1 ¶11].

Relying upon the advice of RCCL's medical personnel, Mr. and Mrs. Vaglio returned to their cabin at around 10:45 a.m. [DE 1 ¶12]. Shortly after noon, the Decedent's son and daughter-in-law returned to the cabin and noted a deterioration in the Decedent's status. [DE 1 ¶13]. Donna Vaglio called the ship's 911 line to get immediate medical attention for her father-in-law, there was a delay of approximately 20 minutes before anyone arrived with a wheelchair to transport Mr. Vaglio to the infirmary. [DE 1 ¶13]. After he arrived at the infirmary there were additional delays before he was seen, while the ship personnel obtained credit card information. [DE 1 ¶14]. Then, at approximately 1:45 p.m. the ship's physician began a mannitol drip in order to transfer ashore to King Edward Memorial Hospital. [DE 1 ¶15]. However, by the time Mr. Vaglio arrived at King Edward Memorial Hospital at approximately 4:22 p.m., his condition had deteriorated to the extent that he was not salvageable. [DE 1 ¶16].

On the following day Mr. Vaglio was air lifted to Winthrop University Hospital in Mineola, New York, where he remained in intensive care until he passed away a week later on August 1, 2011. [DE 1 ¶17].

**Disposition Below**

Patricia Franza, Mr. Vaglio's daughter and personal representative of his estate, instituted an action against RCCL arising out of the facts noted above. The Complaint contains three Counts. [DE 1]. The first Count asserts "Negligent Medical Care and Treatment" on the part of nurses, and physicians employed by RCCL. [DE 1 ¶6; 7]. Specifically, the Plaintiff alleged that:

> That the Defendant, RCCL, by and through the acts of its employees or agents, was negligent, in one or more of the following ways:
> (a) in failing to properly assess the condition of PASQUALE VAGLIO;
> (b) in allowing a nurse to make the initial assessment;
> (c) in failing to have a doctor assess the patient;
> (d) in failing to timely diagnose and appropriately treat the patient;
> (e) in failing to order appropriate diagnostic scans to further assess the degree of injury;
> (f) in failing to obtain consultation with appropriate specialist;
> (g) in failing to properly monitor the patient;
> (h) in failing to evacuate the patient from the vessel for further care in a timely manner;
> (i) in deviating from the standard of care for patients in Mr. Vaglio's circumstances who had suffered a significant blow to the head.

[DE 1 ¶20].

Count II of the Complaint asserts "Negligence of RCCL Based Upon Apparent Agency" for the actions of its medical staff. Specifically, the Plaintiff alleged:

26.    That at all times material, the Defendant, RCCL, held out its medical staff,

3

including its doctors and nurses, as being its employees who work in the Defendant's "medical centers" on the vessel. That the Defendant, RCCL, promotes its medical staff and represents them as being their employees through brochures, internet advertising, and on the vessel. That RCCL held out its staff, including RACQUEL Y. GARCIA, R.N. and ROGELIO GONZALES, M.D., as being direct employees or its actual agents.

27.    That the Defendant, RCCL, promotes the idea that the medical staff who work in its "medical centers" are employed by the cruise line as part of a marketing tool to induce passengers such as the Plaintiff to buy cruises on its ships, particularly because the cruise line goes to various foreign ports which may not have adequate medical care.

28.    That RCCL manifested to the Plaintiff in this case that its medical staff, including RACQUEL Y. GARCIA, R.N. and ROGELIO GONZALES, M.D., were acting as its employees and/or actual agents in various ways, including but not limited to the following:

(a)    the doctor and nurse both worked at what the Defendant describes in its advertising as its "medical centers";

(b)    that the "medical centers" are owned and operated by RCCL, which pays to stock the "medical centers" with all supplies, various medicines and equipment; (c) that the passenger is billed directly by RCCL through the passengers' Sign and Sail Card, whereas the "medical staff", including the doctor and nurse, are paid salaries by RCCL to work in the "medical centers".

29.    That the medical staff in this case, including RACQUEL Y. GARCIA, R.N. and ROGELIO GONZALES, M.D., were given uniforms to wear which include name tags, and which have the RCCL name and logo. Said uniforms were required by RCCL to be worn by the doctor and nurse.

30.    That the doctor is considered to be an Officer on board the vessel and a member of the crew, and was introduced to the passengers as one of the ship's Officers.

31.    That both the ship's doctor and the nurse were held out to the passengers by RCCL as being members of the ship's crew.

4

32. That the Defendant put the ship's physician and nurse under the command of the superior officers, including the Master of the ship.

33. That the cruise line represents to immigration authorities that the physician and nurse are members of the ship's crew.

34. That both the ship's doctor and nurse are permitted to eat with the ship's crew.

35. That the ship's physician and nurse provide services in the ship's "medical centers" and the Plaintiff was required to go to the ship's medical center to be seen for his injuries.

36. That at the time of Plaintiff's injury, the Plaintiff was seen and briefly examined by the ship's nurse and/or physician.

37. That based on the foregoing, the Plaintiff believed, and was reasonable in his belief, that the ship's nurse and doctor were acting as direct employees or actual agents on behalf of the Defendants, and was never given any reason to believe otherwise.

38. That the Plaintiff relied to his detriment on his belief that the physician and nurse were direct employees or actual agents of the Defendant in that the Plaintiff followed the advice of the nurse and/or physician who did not seek any further medical testing or evaluation while the ship was in Bermuda, that he relied on the ship's nurse and/or physician, that he did not follow-up with the ship's medical staff as he was told that he did not have any serious injury.

39. That as a result of the Plaintiff's reliance upon the ship's medical staff, the Plaintiff's status was not properly diagnosed and his condition deteriorated to the point that he passed away.

Count III entitled "Negligent Hiring, Retention and Training by RCCL" asserts liability against RCCL for negligently hiring, retaining and/or training its physicians and medical staff.

5

RCCL filed a motion to dismiss Plaintiff's complaint and strike Plaintiff's demand for trial by jury. [DE 7]. As for the motion to dismiss, RCCL argued chiefly that it could not be sued under the doctrine of *respondeat superior* for the negligence of its ship's doctor pursuant to *Barbetta v. S/S Bermuda Star*, 848 F.2d 1364 (5th Cir. 1988). [DE 7 p.3]. In addition, RCCL asserted that it could not be held liable for the negligence of its ship's physician on the theory of apparent agency. [DE 7 p.4-9]. In addition, RCCL argued that Plaintiff had failed to properly allege negligent hiring, retention and training. [DE 7 p.9-11]. Finally, RCCL argued that the claim was governed by the Death on the High Seas Act (DOHSA) and moved to strike the demand for jury trial. [DE 7 p.11-14].

The Plaintiff responded to the motion to dismiss [DE 13] asserting that the District Court, in the absence of Eleventh Circuit precedent, was free to reject the outdated *Barbetta* rule. [DE 13 p.4-11]. In addition, the Plaintiff sought Rule 54 (b) certification on that point. Next, the Plaintiff argued that, notwithstanding whether RCCL could be sued under the theory that its ship's physician was its actual agent, it could nevertheless be sued because it had held out its ship's physician as its apparent agent. [DE 13 p.12-18]. The Plaintiff also asserted that Count III of the complaint adequately stated a cause of action for negligent hiring or retention [DE 13 p.18-19].

6

Following completion of the briefing on the motion to dismiss, the District

Court entered an order granting Defendant's Motion to Dismiss [DE 24]. The District

Court denied the Plaintiff's request to reject *Barbetta*, and instead embraced that

decision and dismissed the Plaintiff's actual agency count with prejudice, and Counts

II (Apparent Agency) and III (Negligent Hiring and Retention) without prejudice.

[DE 24 p.12-13]. The District Court also allowed Plaintiff fourteen (14) days to file

an amended complaint. [Id.]. Believing that her complaint asserted valid causes of

action, the Plaintiff elected not to file an amended complaint and to proceed directly

with this appeal.[1]

## <u>STANDARD OF REVIEW</u>

This Court reviews *de novo* the District Court's grant of a motion to dismiss

for failure to state a claim, accepting the allegations in the complaint as true and

construing them in a light most favorable to the plaintiff. *Chaparro v. Carnival

Corp.,* 693 F.3d 1333 (11th Cir. 2012); *American Dental Association v. Cigna Corp.,*

605 F.3d 1283 (11th Cir. 2010). Thus, in considering a motion to dismiss, a court

should eliminate any legal conclusions contained in the complaint, and then

determine whether the factual allegations, which are assumed to be true, give rise to

---

[1] The Plaintiff has elected not to pursue her claim for negligent hiring or retention of
medical staff.

relief. *Id*. at 1290.

## SUMMARY OF THE ARGUMENT

Much has changed in the world since the late 19th century when state courts in Massachusetts and New York first ruled that a vessel's passengers could not sue a shipowner under a theory of vicarious liability for the negligence of the ship's physician.  Incredibly, the world has changed even more in the scant 25 years since the Fifth Circuit relied upon those decisions in *Barbetta v. S/S Bermuda Star*, 848 F.2d 1364 (5th Cir. 1988) to assert that it is "pure sophistry" to suggest that a modern cruise line could exercise any form of control over its ship's medical personnel.

Despite the fact that Miami, Florida is widely considered to be the cruise capital of the world, this issue has never reached this Court.  Nevertheless, the majority of courts which have considered the issue post-*Barbetta* have agreed that, due to technological advances in communications and medicine, the *Barbetta* rationale is outdated, if it ever had any legitimacy in the first place.  *See, Fairley v. Royal Cruise Line, Ltd.,* 1993 AMC 1633 (S.D. Fla. 1993); *Carlisle v. Carnival Corp.*, 864 So.2d 1 (Fla. 3d DCA 2004), *rev'd, Carnival Corp. v. Carlisle*, 953 So.2d 461 (Fla. 2007); *Mack v. Royal Caribbean Cruises Ltd.*, 361 Ill.App.3d 856, 297 Ill.Dec. 593, 838 N.E.2d 80 (2005).  Unfortunately, although the Florida Supreme Court agreed that *Barbetta*'s reasoning was flawed and invalid, it felt compelled to

8

follow *Barbetta* in order to maintain "uniformity" in maritime law.

Two years after the Florida Supreme Court issued its ruling, virtually all cruise line passenger claims in this country were diverted to federal court – specifically the Southern District of Florida – when Florida's Third District Court of Appeal enforced a forum selection clause in Carnival's ticket in the case of *Leslie v. Carnival Corp.*, 22 So.3d 567 (Fla. 3d DCA 2009) (*en banc*) *rev. den.*, 44 So.3d 1178 (Fla. 2010).

Thus, this case arrives as a case of first impression in this Circuit. On behalf of millions of cruise passengers we respectfully urge this Court to reject the 19th century fiction perpetuated by *Barbetta*, and acknowledge the 21st century realities of modern cruising, modern medicine, and most importantly, modern technology. This Court should reverse the dismissal of this case, and hold that RCCL may be sued for *respondeat superior* liability for the negligence of its medical personnel, provided that sufficient facts can be marshaled to support such a claim.  In short, we ask this Court to create conflict with *Barbetta*, and pave the way for the United States Supreme Court to explicitly acknowledge such a cause of action.

## ARGUMENT

I.    **ON *DE NOVO* REVIEW OF THIS CASE OF FIRST IMPRESSION IN THIS CIRCUIT, THIS COURT SHOULD REJECT THE ANACHRONISTIC *BARBETTA* RULE**.

9

**Admiralty Law Applies**

Under general maritime law, a cruise ship owner owes a duty to its passengers to exercise "reasonable care under the circumstances." *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632 (1959). As the district court properly observed, "where an alleged tort occurs aboard a ship sailing upon navigable waters, federal maritime law governs resulting substantive claims," *Wilkinson v. Carnival Cruise Lines, Inc.,* 920 F.2d 1560, 1564 n.10 (11th Cir. 1991), and the same holds true when the alleged tort occurs at a scheduled port of call. *Doe v. Celebrity Cruises, Inc.,* 394 F.3d 891, 901-02 (11th Cir. 2004).

**An Historical Perspective on Holding Cruise Lines
Liable for the Negligence of Their Ships' Physicians**

The central issue in this appeal is whether RCCL, or any owner/operator of a common carrier vessel may be held liable for the negligent treatment of passengers by the ship's medical personnel. There are two distinct lines of cases which fall on either side of this question. The traditional 19th century, or *Barbetta* rule, derives its name from *Barbetta v. S/S Bermuda Star*, 848 F.2d 1364 (5th Cir. 1988), which rests upon 19th century state law authority. *See, e.g., O'Brien v. Cunard S.S. Co.,* 154 Mass. 272, 28 N.E. 266 (1891) and *Laubheim v. Netherland S.S. Co.,* 107 N.Y. 228, 13 N.E. 781 (N.Y. Ct. App. 1887).

10

The facts of *O'Brien v. Cunard* are instructive from both an historical and legal perspective.  Mary O'Brien, an Irish immigrant from Queenstown (now Cobh) Ireland, in County Cork, Ireland, was aboard the Cunard vessel as part of the massive Irish immigration to the United States in the second half of the 19th century.  As the court noted, Boston, the port of entry, maintained strict quarantine regulations in regard to examination of "emigrants" to see that they were protected from small pox by vaccination aboard vessels prior to debarkation.  28 N.E. at 273.  The circumstances of her vaccination were that approximately 200 women passengers were assembled below deck, and those without marks on their arm were vaccinated by the ship's physician.  Mary O'Brien claimed that she had previously been vaccinated even though there was no mark, but her claim of prior vaccination was either rejected or ignored, and she was vaccinated.  Ms. O'Brien's actions on the day in question were, at best, equivocal, as she never specifically objected to the vaccination.

Mary O'Brien sued the ship's physician as well as Cunard.  The court ruled against her on her claim of assault.  In addition, the court ruled that the steamship operator could not be held vicariously liable:

> It is quite reasonable that the owners of a steamship used in the transportation of passengers should be required by law to provide a competent person to whom sick passengers can apply for medical

11

treatment, and when they have supplied such a person it would be
unreasonable to hold them responsible for all the particulars of his
treatment when he has engaged in the business of other persons, in
regard to which they are powerless to interfere.

*Id*. at 276.

In *Laubheim*, the New York State Court of Appeals held that "if, by law, or

by choice, the defendant was bound to provide a surgeon for its ships, its duty to

the passenger was to select a reasonably competent man for that office, and it is

liable only for a neglect of that duty."  13 N.E. 781 (citing, *inter alia*, *Chapman v.*

*Erie Railway Co.*, 55 N.Y. 579 (N.Y. 1874); *McDonald v. Massachusetts General*

*Hospital*, 120 Mass. 432 (1876).  The citation to *McDonald v. Massachusetts*

*General Hospital*, 120 Mass. 432 (1876) by the *Laubheim* court is curious.  In

*McDonald*, the Massachusetts court adopted the doctrine of charitable immunity

with respect to hospitals.  It appears that even the *McDonald* case stood on shaky

ground as it relied upon the English case of *Feoffees of Heriot's Hospital v. Ross*,

12 C + F. 507, 8 Eng. Rep. 1508 (1846).  However, ten years before *McDonald*

was decided, the English Courts had repudiated the doctrine in *Mersey Docks*

*Trustees v. Gibbs*, 11 H.L. Cas. 686, 12 Eng. Rep. 1500 (1866).  The *Laubheim*

court apparently was unaware of that reversal.  *See Bonnano v. Harvard Pilgrim*

*Healthcare,* 2000 WL 49639 (Mass. Super. 2000) (acknowledging the overruling

12

of the *McDonald* decision).

## The Modern Rule

More than three quarters of a century after *O'Brien* and *Laubheim,* in the case of *Nietes v. American President Lines, Ltd.*, 188 F.Supp. 219, 221 (N.D. Cal. 1959) a California District Court rejected the ancient doctrine espoused by the earlier cases for several practical reasons.  First, the court noted that even then (over 60 years ago) significant advances in communication compelled a departure from ancient authority:

> It is our opinion, where a ship's physician is in the regular employment of a ship, as a salaried member of the crew, subject to the ship's discipline and the master's orders, and presumably also under the general direction and supervision of the company's chief surgeon through modern means on communication, he is, for the purposes of *respondeat superior* at least, in the nature of an employee or servant for whose negligent treatment of a passenger a shipowner may be held liable.  The same would be true, a *fortiori* as to a ship's nurses.

188 F.Supp. at 220.

Second, the court noted the financial incentives justifying a shift in the law in favor of holding shipowners liable:

> There is reason for imposing such liability, because the employment of a doctor aboard ship is a beneficial substitute for the shipowner's otherwise more costly duty to sick passengers.  Where the ship carries no ship's physicians or nurse, the carrier is under a duty to provide such care and attention as is reasonable and practicable under the circumstances, and this has traditionally required the master to change

13

course and to put in at the nearest port, according to the gravity of the illness. *The Iroquois*, 1904, 194 U.S. 240, 24 S.Ct. 640, 48 L.Ed. 955. This duty extends to both passengers and seamen whose lives may be threatened by illness onboard. ... the shipowner, by providing a physician aboard ship, avoids his sometimes inconvenient and costly duty to change course for the benefit of an ailing passenger. This arrangement gives the shipowner competitive advantage in the maritime passenger industry over those sea-going carriers which have not provided the safety of on-board medical service.

188 F.Supp. at 221 (N.D. Cal. 1959). *Nietes* citation to *The Iroquois* is significant

because that United States Supreme Court decision demonstrably affects the

analysis undertaken by the courts in *Laubheim* and *O'Brien* in the latter part of the

19th century. The vessel Iroquois was a freighter, not a common carrier, and the

issue addressed by the Supreme Court was whether the vessel owner could be held

liable for failing to put into an intermediate port and procure proper surgical

attendance upon an injured crew member. In discussing that duty, the Supreme

Court made the following observation:

Upon large passenger steamers a physician or surgeon is always employed, whose duty it is to minister to the passengers and crew in cases of sickness or accident.

194 U.S. at 242. Thus, even in 1904, nine years before the sinking of the Titanic,

the United States Supreme Court spoke in terms of "employed" physicians whose

"duty" it was to minister to passengers and crew, rather than to independent

physicians who happen to be aboard the vessel for the "convenience" of

14

passengers and whose remuneration might, therefore, be deemed to depend solely upon whether any passenger happened to fall ill and "independently" employ him on a particular voyage. *Nietes* properly recognized the role of the ship's physician and held that, under appropriate circumstances, a vessel owner could be held liable for the negligence of its physician.

Ten years after *Nietes* a New York district court judge, after a full bench trial, rejected *Nietes* upon the following *ipse dixit* analysis:

> It is pure sophistry to assert that a ship's master is capable of 'supervising' the medical treatment rendered by a physician, or that some shore-based 'company chief surgeon,' by his very existence, is capable of supervising or controlling the actions of a ship's physician. ...

*Amdur v. Zim Israel Navigation Co.*, 310 F.Supp. 1033, 1042 (S.D. N.Y. 1969). Well, there you have it. Once a proposition has been deemed "pure sophistry," any further discussion or analysis is foreclosed.

Any yet ... despite its pronouncement of "pure sophistry" the *Amdur* court acknowledged that Israeli law (which it was applying) might evidence "a similar trend in decision toward *Nietes*." However, the court found it unnecessary to reach that issue because it determined factually that no negligence or malpractice had occurred in the first instance. *Id.* at 1043.

15

### *Barbetta*

The Fifth Circuit is the only U.S. Circuit Court of Appeal to address this issue in the past 95 years.  *See Barbetta v. S/S Bermuda Star,* 848 F.2d 1364 (5th Circuit 1988); *The Great Northern*, 251 F. 826, 830-32 (9th Cir. 1918); *The Korea Maru*, 254 F. 397, 399 (9th Cir. 1918).  Each of those circuit court decisions rests largely on 19th century state court analysis.  The Ninth Circuit might be forgiven for doing so in 1918, but not so the Fifth Circuit in 1986.  In *Barbetta*, the Fifth Circuit elected to sail with the current of (largely) district court and state court decisions from a by-gone era, and affirmed the district court's entry of summary judgment.  The court repeated the *Amdur ipse dixit* that *Nietes* represented "pure sophistry."  *Barbetta*, 848 F.2d at 1371.

*Barbetta* acknowledged that a carrier owes its sick and injured passengers a duty to exercise "reasonable care to furnish such aid and assistance as ordinarily prudent persons would render under similar circumstances," but, at the same time, held somewhat inconsistently, that a carrier "owes no duty to maintain a doctor onboard for the benefit and convenience of its passengers."  *Id*. at 1371.  These competing observations suggest a cognitive dissonance inherent in the traditional rule, and one which can no longer be maintained.

*Barbetta* itself is now a quarter century old.  When *Barbetta* was decided,

16

cell phones were barely in existence and were roughly the size and heft of a brick.

Microsoft was only two years beyond its initial public offering.  The personal

computer and the internet were in their infancies, and the worldwide web was not

yet established.  Given this recent and rapid development of technology, one

wonders if the Fifth Circuit would still consider it to be "sophistry" to suggest that

cruise lines such as RCCL could supervise medical treatment rendered by a

physician onboard one of its floating cities.  Subsequent courts have largely

scoffed at *Barbetta*'s conclusions, and *Barbetta* has persevered largely by inertia

rather than reason, or logic, or law.

### More Recent Treatment of the Issue by Courts Located Within the Jurisdiction or Geographic Footprint of the Eleventh U.S. Circuit Court of Appeals.

This is a case of first impression in this Circuit.  However, it is significant

that one member of the Eleventh Circuit Court of Appeal who has addressed these

issues, was openly critical of *Barbetta*.  *See Fairley v. Royal Cruise Line, Ltd.,*

1993 AMC 1633 (S.D. Fla. 1993) (then U.S. District Court Judge Stanley

Marcus).  After acknowledging that the "overwhelming tide of case law" holds

that a shipowner may not be held vicariously liable for the torts of the ship's

doctor, Judge Marcus marshaled the significant criticism of that rule, *citing* Beth

Ann Erlic Herschaft, Comment*, Cruise Ship Medical Malpractice Cases: Must*

17

*Admiralty Courts Steer by the Star of Stare Decisis?*  17 Nova L. Rev. 574, 584

(1992) (discussing the incongruity of holding the carrier vicariously liable under

the Jones Act where the patient is a *seaman*, but insulating the carrier where the

patient is a passenger).  Judge Marcus referred to one of the leading treatises on

Maritime Law, 1 M. Norris, *The Law of Maritime Personal Injuries*, 3:10 at 75,

which acknowledged that the ship's doctor is not an independent contractor, but

"in fact, a paid employee of the shipowner...subject to ship's discipline under the

general maritime law... ."  *Fairley*, 1993 AMC at 1635 n.2.

Turning to *Barbetta*, Judge Marcus observed that the rule against vicarious

liability of a shipowner has been justified on two grounds: (1) a shipping company

is not in the business to provide medical services to passengers; and (2) that it is

the patient, and not the shipowner, who actually controls the physician.  *Id.* at

1636.

Next, Judge Marcus traced the more modern line of authority, beginning

with *Nietes v. American President Lines, Ltd.*, 188 F.Supp. 219 (N.D. Cal. 1959).

In response to the old bromide that a cruise ship is not a "floating hospital," Judge

Marcus observed that it is more like a "floating hotel," with the exception that the

passengers on a floating hotel "are in a radically different situation from the guests

in a hotel ashore: they are a captive audience;  the passengers are not "free to

18

contract with [the physician] for any medical services they may require."  1993

AMC at 1638.  Judge Marcus appreciated the passengers' predicament: "if a

passenger is ill, and port is distant, the ship's doctor is the passenger's only resort,

since evacuation by air rescue is expensive, possible and appropriate only for

emergencies."  *Id.* at 1638-1639.

Next, Judge Marcus laid bare the canard, still evident in cruise line

passenger tickets, that the ship's physician is merely "carried onboard a ship for

the convenience of passengers."  *Id*. at 1639.  Judge Marcus noted that the

alternative to carrying a physician onboard is that the shipowner must discharge its

duty to a sick passenger by putting into port or summoning air rescue.

Accordingly, "the carrier avoids many of these costs and inconveniences by the

economic expedience of carrying the ship doctor.  The carrier benefits once again

by advertising the availability of the ship doctor, since the presence of a qualified

physician onboard, with a well-equipped and well-staffed infirmary is an

enticement to purchase the ticket."  *Id*.

In response to the argument that the ticket contract claims that the physician

is an independent contractor, Judge Marcus noted that 46 U.S.C. App. 183 c (now

46 U.S.C. 30509) prohibits owners of vessels transporting passengers from

disclaiming liability "in the event of loss of life or bodily injury arising from the

negligence or fault of such owner or his servants." *Id.* at 1641 n.7. *See also*

*Fojtasek v. NCL (Bahamas) Ltd.*, 613 F.Supp.2d 1351, 1555 (S.D. Fla. 2009)

(*citing Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1335 (11th Cir.

1984)).

Eleven years after *Fairley*, Florida's Third District Court of Appeal became

the first 21st century court to address the *Barbetta/Nietes* competing lines of

authority. *See Carlisle v. Carnival Corp.,* 864 So.2d 1 (Fla. 3d DCA 2004), *rev'd,*

*Carnival Corp. v. Carlisle,* 953 So.2d 461(Fla. 2007). Like Judge Marcus, the

Third District agreed that the *Barbetta* line of cases "are based upon flawed and

outmoded assumptions regarding cruise ship industry and the provision of medical

services to passengers... ." *Id*. at 3. The Third District, "like many of the

commentators, [found] *Nietes* to be the most persuasive precedent," observing:

> While *Barbetta* criticized *Nietes* as unrealistically presuming away
> the problem by assuming a ship's doctor was under sufficient control
> via modern communication with a company's chief surgeon, the
> *Barbetta* line of cases rests on even shakier fictions. *Barbetta*'s
> finding that the cruise line should not be held responsible is premised
> on the unrealistic suggestion that an ailing cruise passenger at sea has
> some meaningful opportunity to simply forego treatment by the ship's
> doctor and demand that the captain fulfill his duty of care in some
> other fashion. ...

*Id*. at 5.

The Third District correctly noted that the likelihood of demanding that the

20

captain fulfill the duty of reasonable care in some other way "was no more realistic

in 1891 than it is today." *Id*. at 5. Picking up where Judge Marcus had left off, the

court also observed:

> The fallacy of the notion that the acutely ill passenger at sea has sifted
> through a series of options and ultimately chosen to use the ship's
> doctor underscores the fiction of the familiar incantation that the
> physician is onboard merely for the "convenience of the passenger."
> In reality, as has been recognized, the ends of the cruise line are, at
> the very least, equally served by being able to fulfill its duty to ill or
> injured passengers without necessarily being required to disrupt the
> voyage or incur great expense to evacuate the patient every time a
> medical situation arises.

*Id*. at 6.

The court concluded that "the practical realities of the competitive cruise

industry, and the reasonably anticipated risks of taking a small city of people to

sea for days at a time, all but dictate a doctor's presence." *Id.* Furthermore, just as

Judge Marcus had done in *Fairley*, the court rejected the defense that the

exculpatory language contained in the passenger ticket could pass muster under 46

U.S.C. §30509.

Following the Third District Court of Appeal's decision in *Carnival Corp.*

*v. Carlisle*, the tide quickly turned against *Barbetta* and in favor of *Nietes*. In

*Huntley v. Carnival Corp.*, 307 F.Supp.2d 1372 (S.D. Fla. 2004), the court found

the Third District's opinion in *Carlisle* to be "thorough and well-reasoned." In

21

*Mack v. Royal Caribbean Cruises, Ltd.*, 361 Ill.App.3d 856, 297 Ill. Dec. 593, 838 N.E.2d 80, 91 (2005) the court held that federal maritime law was unsettled and affirmed that denial of the shipowner's motion to dismiss in accord with the holdings of *Nietes*, *Huntley*, and *Fairley*. Unfortunately, this "age of enlightenment" soon came to a grinding halt at the Florida Supreme Court, but not because that court found *Barbetta*'s reasoning to be sound; in fact it found quite the opposite.

### The Florida Supreme Court Sacrificed Common Sense on the Altar of Maritime Uniformity

Carnival sought and obtained review of *Carlisle* before the Florida Supreme Court. That Court openly acknowledged that the Third District's opinion "has some appeal because much has changed in the world in the one hundred years since the earlier courts held shipowners immune from such claims." 953 So.2d at 470. One of the Florida Supreme Court's chief criticisms of *Barbetta* was that "rather than analyze the particular relationship between the parties to determine whether aspects of control could in fact exist, the *Barbetta* decision relied upon factual conclusions of earlier maritime cases to support the general maritime rule." *Id*. at 467.

Significantly, the Florida Supreme Court rejected the *Barbetta/Amdur* suggestion of "sophistry," and agreed with the Third District that "modern means

22

of communication make it possible for the actions of the shipboard doctor to be controlled and supervised by a doctor thousands of miles away." 953 So.2d at 470. Nevertheless, and despite the fact that the Florida Supreme Court ["found] merit in the plaintiff's argument and the reasoning of the district court" it reluctantly concluded that "because this is a maritime case, this Court and the Florida District Courts of Appeal must adhere to the federal principles of harmony and uniformity when applying federal maritime law." *Id.*[2] Thus did the Florida Supreme Court sacrifice common sense and good public policy on the altar of maritime law uniformity, itself a notoriously mythical concept. *See, The Myth of Uniformity in Maritime Law,* 21 Tul.Mar.L.J. 103 (1996).[3]

The Florida Supreme Court's submission to mythical maritime uniformity was unwise and unwarranted. The true defining characteristic of federal maritime law is not uniformity, but evolution. Just two years before *Barbetta,* the U.S.

_____

[2] The great and perhaps cruel irony of the Florida Supreme Court's decision in *Carlisle* is that it is little more than a vestigial authority in light of the decision in *Leslie v. Carnival Corp.,* 22 So.3d 567 (Fla. 3d DCA 2009) (*en banc*) *rev. den.,* 44 So.3d 1178 (Fla. 2010) in which the Third District Court of Appeal upheld a forum selection clause in Carnival's ticket requiring litigation of all passenger lawsuits arising out of a passenger's cruise to be filed exclusively in the United States District Court for the Southern District of Florida. As a result, nearly all cruise lines have inserted similar provisions into their ticket contracts. Accordingly, except in rare circumstances, there will be no more cruise line passenger tort claims of any kind litigated in Florida state courts. That particular buck has been passed to the federal courts.

[3] Unfortunately, the Florida Supreme Court's decision caused trial court judges in the Southern District of Florida to revert back to the 19th century rule. *See, e.g., Hesterly v. Royal Caribbean Cruises, Ltd.,* 515 F.Supp.2d 1278, 1284 n.2 (S.D. Fla. 2007).

23

Supreme Court described maritime law as "an amalgam of traditional common law rules, modification of those rules, and newly created rules" *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 865, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), as it embraced strict product liability theories into the bosom of maritime law.

More recently, in *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 508 n.21 (2008), the High Court championed the role of the judiciary in the recognition of novel maritime actions and remedies.  Among those noted were *American Export Lines, Inc. v. Alvez*, 446 U.S. 274 (1980) (recognizing cause of action for loss of consortium); *Moragne v. States Marine Lines, Inc*., 398 U.S. 375 (1970) (recognizing cause of action for wrongful death under general maritime law).  In *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975) the Supreme Court abrogated the centuries old admiralty rule of divided damages in favor of proportional liability, noting that "the Judiciary has traditionally taken the lead in formulating flexible and fair remedies in the law maritime, and Congress has largely left to this Court the responsibility for fashioning the controlling rules of admiralty law... ."  *Id*. at 409.

In fact, to the extent that uniformity exists, it does so in the form of maritime courts embracing general common law principles contained in the Restatement

24

(Second) of Torts rather than the specific laws of individual states. *See, e.g., Wells v. Liddy,* 186 F.3d 505, 525 (4th Cir. 1999) (adopting the Restatement definition of defamation for maritime law); *Davis v. Portline Transportes Maritime Internacionale,* 16 F.3d 532, 541-42 (3d Cir. 1994) (adopting Restatement (Second) of Torts §343, known as the "Safe Workplace Doctrine," for actions under §905(b) of the LHWCA.); *East River S.S. Corp. v. Transamerica Delavel, Inc.,* 476 U.S. 858 (1986) (adopting Restatements (Second) of Torts §402(a) Principles of Strict Products Liability); *Furness Withy (Chartering), Inc. of Panama v. World Energy Systems Assoc., Inc.,* 772 F.2d 802 (11th Cir. 1985) (noting that the district court properly looked at a Restatement (Second) of Torts for guidance in resolving issues raised by maritime claim).

One such example is the Restatement (Second) of Agency Section 220 which describes agency relationships giving rise to vicarious liability in comment C:

> The relation of master and servant is one not capable of exact definition. It is an important relation in that upon it depends the liability of the master to third persons and to his employees under the provisions of various statutes as well as under the common law; the relation may prevent liability, as in the case of the fellow servant rule. It cannot, however, be defined in general terms with substantial accuracy. The factors stated in Subsections (2) are all considered in determining the question, and it is for the triers of fact to determine whether or not there is a sufficient group of favorable factors to establish the relation.

25

This Court has recognized this very proposition recently when analyzing the issue of a putative maritime employer's control over a worker:

> [T]he employer-employee relationship exists only where the employer has the right to control and direct the work, not only as to the result to be accomplished by the work, but also as to the manner and means by which that result is accomplished ... Significantly it is the right and not the actual exercise of control that is the determining element of employment ... . Consequently, assessing whether a principal had the right of control is highly fact dependent and a variety of considerations may be probative. These considerations include: (1) direct evidence of the principal's right to or actual exercise of control; (2) the method of payment for an agent's services, whether by time or by the job; (3) whether or not the equipment necessary to perform the work is furnished by the principal; and (4) whether the principal had the right to fire the agent.

*Langfitt v. Federal Marine Terminals, Inc.*, 647 F.3d 1116, 1121 (11th Cir. 2011). The Plaintiff respectfully submits that each of these four considerations suggest that the ship's medical personnel are agents of the cruise line.

### The Commentators Abhor *Barbetta*

Notwithstanding the Florida Supreme Court's ruling, virtually all maritime legal scholars and commentators have "uniformly" criticized the *Barbetta* rule. *See, e.g.,* Beth-Ann Erlic Herschaft, *Cruise Ship Medical Malpractice Cases: Must Admiralty Courts Steer by the Star of Stare Decisis?,* 17 NOVALR 575 (Fall of 1992); Thomas A. Dickerson, *The Cruise Passenger's Dilemma: 21st Century Ships, 19th Century Rights,* 28 TLNMLJ 447 (Tulane Maritime Law Journal 2004);

26

Michael J. Compagno, *Malpractice on the Love Boat: Barbetta v. SS Bermuda Star,* 14 TLNMLJ 381 (Tulane Maritime Law Journal Spring 1990); Thomas A. Gionis, *Paradox on the High Seas: Evasive Standards of Medical Care - Duty Without Standards of Care; A Call for the International Regulation of Maritime Healthcare Aboard Ships,* 34 JMARLR 751 (Spring 2001). *See generally, Mack v. Royal Caribbean Cruises, Ltd.,* 838 N.E.2d 80, 88-89 (Ill.Ct.App. 2005) (cataloging such articles).

Most recently, in Robert D. Peltz, *Has Time Passed Barbetta By?*, 24 U.S. Fl. Mar. L. J. 1 (Spring 2012) ("Peltz"), the author further lays bare the fallacy of the *Barbetta* holding in light of recent technological advances and a recent Congressional enactment.

Congress enacted the Cruise Vessel Security and Safety Act ("CVSSA") to "ensure the security and safety of passengers and crew on cruise vessels." 46 U.S.C.A. §§3507, 3508 (West Supp. 2011). The CVSSA mandates that cruise ship's carry "medical staff" to provide "medical treatment" to sexual assault victims. The statute requires the cruise line to provide a medical staff including a physician or registered nurse with at least three years of post-graduate or post-registration clinical practice in general and emergency medicine or who holds board certification in emergency medicine, family practice medicine, or internal

27

medicine.  46 U.S.C.A. §3507(d)(3).  "While section 3(A) of the Act implies that

the vessel owner and operator may meet their responsibilities by providing either a

licensed physician or registered nurse, the subsequent sections clearly require a

physician."  Peltz, 24 U.S.F. Mar. L. J. at 4-5.  Accordingly, it can no longer be

argued – if it ever credibly could be – that a physician is carried aboard a cruise

ship solely as a convenience to its passengers.  To the contrary, physicians are now

required as a matter of U.S. statutory law.  *Id.*

Furthermore, RCCL's vessels are flagged in the Bahamas, and Section 124 of

the Bahamian Merchant Shipping Act of 1976 provides in pertinent part:

> (1) Every Bahamian foreign going ship which proceeds from a port
> having one persons or more on board shall carry on board as a part of
> her compliment a duly qualified medical practitioner; ...

> (2) For the purpose of subsection (1) of this section a duly qualified
> medical practitioner means a medical practitioner authorized by law to
> practice as a legally qualified medical practitioner in any country of
> the Commonwealth or in any country outside the Commonwealth
> approved by the Minister.[4]

The capacity to provide medical service aboard cruise ships has also

significantly improved since *Barbetta*.  In 1995 the American College of

Emergency Physicians *Healthcare Guidelines for Cruise Ship Medical Facilities*

---

[4] Thus, in the present case, RCCL was required by the law of its flag state to provide a
physician – it did not do so merely as a matter of convenience.

28

("ACEP Guidelines") were approved and they were revised thereafter periodically. Peltz at p.12. "In addition to defining the physical parameters and equipment required in shipboard medical facilities, the ACEP Guidelines also set forth ... standards, which *require the existence of shipboard medical staff*

Technological advances in the practice of medicine and in communications in general have severely undercut the already fallacious premise of the *Barbetta* decision. Whatever validity there was to calling the *Nietes* rationale "sophistry" 25 years ago no longer exists. Indeed, Peltz noted that Dr. Grant Tarling, Director of Princess Cruise Lines Medical Department and the incoming Chairman of the American College of Emergency Physicians ("ACEP") Cruise Ship Medicine section has boasted:

> Cruise ship new-builds have continued to innovate over the last fifteen years and the major cruise lines have designed modern medical facilities comprising several ICUs, computerized radiology, and sophisticated laboratories. As a consequence, medical staffing experience and quality has also improved. Some cruise lines' medical departments have achieved accreditation to international healthcare standards and ISO9001 certification.

Letter from the Editor (American College of Emergency Physicians Cruise Ship and Maritime Medicine Section Newsletter), July 2011.

In announcing Princess Cruises' receipt of ISO 9001 certification for its medical facilities, Dr. Tarling observed "I think many people would be surprised

29

and reassured to know that our medical centers achieve similar quality standards to medical facilities ashore."  Press Release, Princess Cruises, *Princess Cruises' Medical Departments Earn Unique Distinction With Prestigious Quality Certification and Accreditation* (May 6, 2010), http://www.princess.com/news/article.jsp?newsArticleId=na1098.  Peltz p.20.

The Appellee RCCL issued a press release one year after the Florida Supreme Court's decision in *Carlisle,* touting the creation of a new position of Vice President and Global Chief Medical Officer for its Medical and Public Health Department, to be manned by Dr. Arthur L. Diskin.  Peltz p.20-21.  The press release touted RCCL's state-of-the-art medical department:

> In his position, which is new to the company, Dr. Diskin is responsible for *managing the medical facilities and staff that provide daily care for the company's guests*, as well as the medical care of more than 40,000 crew members.  This includes the company's new crew wellness program and *the management of all public health issues*, working in coordination with the U.S. Centers for Disease Control and Prevention.

Peltz at p.21.

Furthermore, in the quarter-century since *Barbetta* was decided, cruise lines have refined their ability to communicate instantaneously with their shore-based medical directors and consultants via email and video conferencing.  As Peltz notes, "today, most of the major cruise lines have sophisticated land-based medical

departments, staffed by physicians with extensive emergency medicine and shipboard backgrounds." Peltz at 20. Likewise, advances in tele-medicine have been adopted by the cruise industry. Id. at 23.

Appellee RCCL instituted a tele-dermatology program in 2010 in conjunction with the University of Miami Miller School of Medicine, and has taken advantage of major advancements in the field of x-ray technology by completing the installation of digital x-ray equipment on its ships. Peltz at 25-26. "This new technology enables x-ray images to be transmitted via a secured internet connection instantly to onshore experts for further consultation." Royal Caribbean Cruise Ltd., 2010 Stewardship Report 3, at page 81 (2010) available at

http://viewer.zmags.com/publication/49a26be2#/49a26be2/1.

To summarize, the time has come for maritime courts to acknowledge the type of supervision that modern cruise line companies can, do, and certainly *should* exercise over their onboard medical staff, and to cease engaging in cognitive dissonance as to why cruise ships are outfitted by their owners with medical clinics, equipment, and personnel. It is time to permit passengers to hold the owner of these floating cities responsible for the negligence of their medical personnel, provided sufficient proof can be marshaled in support of their claims.

II.    **THE DISTRICT COURT ERRED IN RULING THAT THE PLAINTIFF HAS NOT STATED A VALID CAUSE OF ACTION BASED UPON THE THEORY OF APPARENT AGENCY**.

The right to sue under apparent agency has been well established. *Elizabeth Fairley v. Royal Cruise Lines Ltd*., 1993 AMC 1633 (S.D. Fla. 1993); *Doonan v. Carnival Corp.,* 404 F.Supp.2d 1367; *Warren v. Ajax Navigational Corp. of Monrovia,* 1995 AMC 2601 (S.D. Fla. 1995); *Rinker v. Carnival Corp.,* 210 US District Lexis 144190; *Lobegeiger v. Celebrity,* 2011 WL 3703329 (S.D. Fla. 2011). *But see, e.g., Hill v. Celebrity Cruises, Inc*., 2011 WL 5360247 (S.D. Fla. 2011).

To prove a claim of apparent agency, a plaintiff must establish three elements: (1) the alleged principal (RCCL) made a manifestation which caused a third party (Mr. Vaglio and family) to believe an alleged agent (the ship's nurse and physician) had the authority to act for the benefit of the principal; (2) such a belief was reasonable; and (3) the claimant reasonably relied on that belief to his or her detriment. *Belik v. Carlson Travel Group, Inc.,* 864 F.Supp.2d 1302, 1311 (S.D. Fla. 2011) (citing *Doonan v. Carnival Corp.,* 404 F.Supp.2d 1367, 1371 (S.D. Fla. 2005). Furthermore, an apparent agency relationship may be created by silence where "the principal knowingly permits the agent to act as if the agent is

32

authorized," or by "acting in a manner which creates a reasonable appearance of an agent's authority... ." *Whetstone Candy Co. v. Kraft Foods, Inc.,* 51 F.3d 1067, 1078 (11th Cir. 2003).

The district court below dismissed the apparent agency claim on the asserted basis that the Plaintiff had failed to establish how her decedent acted or relied on his belief that the ship's medical personnel had the authority to act for the benefit of the principal. [DE 24 p.8].  To the contrary, the Plaintiff did specifically allege that:

> Plaintiff relied to his detriment on his belief that the physician and nurse were direct employees or actual agents of the Defendant in that the Plaintiff followed the advice of the nurse and/or physician who did not seek any further medical testing or evaluation while the ship was in Bermuda, that he relied on the ship's nurse and/or physician, that he did not follow up with the ship's medical staff as he was told that he did not have any serious injury.

[DE 1 ¶38].

The district court cited three decisions from fellow judges of the Southern District in support of its decision.  In *Gavigan v. Celebrity Cruise, Inc.*, 843 F.Supp.2d 1254 (S.D. Fla. 2011), the court held that the allegations of reliance were too conclusory.  In *Rinker v. Carnival Corp.,* 836 F.Supp.2d 1309 (S.D. Fla. 2011) the court held that "Plaintiff's husband does not state that, had he known the doctor and nurses were independent contractors, he would not have sought their

33

medical help for his wife.  Thus, it is not clear how he relied."  In *Warren v. Ajax Navigation Corp*., 1995 WL 688421 (S.D. Fla. 1995) the court dismissed the claim because the plaintiff had not provided sufficient evidence to show that he selected the cruise in reliance that the physician was an agent authorized to act on behalf of the shipowners.  Each of those cases was wrongly decided.

As to the reliance prong, Florida cases involving apparent agency in the context of medical malpractice typically find that "the fact of seeking medical treatment in a hospital emergency room and receiving treatment from a physician working there is sufficient" to create a genuine issue of material fact as to the elements of reliance and detriment.  *See, e.g., Stone v. Palms West Hospital,* 941 So.2d 514, 520-21 (Fla. 4th DCA 2006); *Jones v. Tallahassee Memorial Regional Healthcare, Inc.,* 923 So.2d 1245 (Fla. 1st DCA 2006), *rev. dismissed,* 935 So.2d 500 (Fla. 2006); *Roessler v. Novak,* 858 So.2d 1162 (2d DCA 2003); Orlando Regional Medical Center v. Chmieleski, 573 So.2d 876 (Fla. 5th DCA 1990), abrogated on other grounds, *Boulis v. Fla. Dept. of Transp.,* 733 So.2d 959 (Fla. 1999).

In *Chmieleski*, the court noted that the Restatement (Second) of Torts section dealing with apparent agency "requires no separate proof of 'reliance' and 'detriment,' and further that illustration 3 of the comments to Restatement (Second)

34

of Agency, Section 267 (1958), also does not require these elements, in addition

and apart from the initial representation... ."  573 So.2d 879-80 (Fla. 5th DCA

1990).  *See also Roessler,* 858 So.2d 1162 n.3.

With respect to the detrimental reliance prong plaintiff must merely show a

change of position, which may include any "payment of money, expenditure of

labor, suffering a loss or subjection to legal liability."  *Suter v. Carnival Corp.,*

2007 WL 4662144 at *7 (S.D. Fla. 2007) (quoting, *inter alia*, Restatement

(Second) of Agency, Sections 8B(1) and (3)).  In *Suter*, the court noted that a

hospital may be liable for the negligent acts of the emergency room doctor under a

theory of apparent agency if a patient demonstrates that due to the hospital holding

a doctor out as an agent, the patient justifiably relied upon the care or skill of the

doctor.  *See, e.g., Irving v. Doctors Hosp. of Lake Worth, Inc.,* 415 So.2d 55, 58

(Fla. 4th DCA 1982).

In the present case, as we noted above, the Plaintiff alleged that her decedent

detrimentally relied upon the cruise line's holding out of its medical staff as its

agent in two ways.  First, by following the nurse's instructions to return to his cabin

and rest; and, second, in failing to seek care ashore in Bermuda, rather than on the

vessel.  These allegations clearly meet the test to survive a motion to dismiss for

failure to state a claim as they contain sufficient factual matter which, if accepted

35

as true, state a claim to relief that is plausible on its face. *Chaparro v. Carnival Corp.,* 693 F.3d 1333 (11th Cir. 2012). This plausibility standard simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the defendant's liability. *Id*. at 1337. The allegations contained in Paragraphs 26-39 of the Plaintiff's complaint clearly meet this standard.

## CONCLUSION

Modern cruise ships are indeed floating cities. One of RCCL's more recent launches, the *Oasis of the Seas,* advertises seven distinct neighborhoods, including a mock Central Park. It accommodates over 5,000 passengers, and it is 18 decks high. It contains an onboard carousel and zip-line. It is, in short, not a 19th century ship. It should not be entitled to 19th century fictions or immunities.

The Appellant respectfully requests this Court reverse and remand this matter, and acknowledge that RCCL may be sued on a theory of actual agency*, i.e., respondeat superior*, for the negligence of its ship's medical personnel.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 9,294 words.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on October 17, 2013, I electronically filed the

Initial Brief with the Clerk of the Court using CM/ECF.  I also certify that the

foregoing document is being served this day on all counsel of record or pro se

parties identified on the attached Service List in the manner specified, either via

transmission of Notices of Electronic Filing generated by CM/ECF or in some

other authorized manner for those counsel or parties who are not authorized to

receive electronically Notices of Electronic Filing.

Respectfully submitted,

PHILIP D. PARRISH, P.A.
7301 SW 57th Court, Suite 430
Miami, Florida 33143
Tel:   305-670-5550
Fax:   305-670-5552
phil@parrishappeals.com
*Counsel  for Appellant*

By:*/s/Philip D. Parrish*
        Philip D. Parrish, Esq.
        FBN: 541877

## SERVICE LIST

Joel M. Barnett, Esq.
waksbar@aol.com
WAKS & BARNETT, P.A.
9900 SW 107 Avenue, Suite 101
Miami, Florida 33176
Tel:    305-670-5550
Fax:    305-670-5552
*Counsel for Appellant*

Philip D. Parrish, Esq.
phil@parrishappeals.com
PHILIP D. PARRISH, P.A.
7301 SW 57th Court, Suite 430
Miami, Florida 33143
Tel:    305-670-5550
Fax:   305-670-5552
*Counsel  for Appellant*

Darren W. Friedman, Esq.
dfriedman@fflegal.com
Marcus Mahfood, Esq.
mmahfood@fflegal.com
FOREMAN FRIEDMAN, P.A.
One Biscayne Tower - Suite 2300
2 South Biscayne Boulevard
Miami, Florida 33131
Tel:      305-358-6555
Fax:     305-374-9077
*Counsel for Appellee*